### STATE v. JAGGERS.

1. EVIDENCE—DYING DECLARATIONS.—In order to render statement before death admissible, it must appear that at time of making it declarant was so fully aware that his death was imminent as to have lost all hope of recovery.
2. IBID.—REPLY.—THREATS made by defendant against deceased before homicide were improperly admitted here as in reply to defendant's case.

Before BUCHANAN, J., York, November term, 1899. Reversed.

Indictment against William Jaggers for murder of George Burris. From verdict of guilty and sentence thereon, defendant appeals.

*Messrs. Jas. F.* and *Jno. R. Hart,* for appellant. The latter cites: *As to admissibility of statement by deceased:* 15 Rich., 342; 9 S. C., 211; 13 S. C., 463; 26 S. C., 152; 34 S. C., 139. *Threats offered by State, not in reply:* 5 Strob., 36.

*Solicitor Henry,* contra.

June 19, 1900. The opinion of the Court was delivered by

MR. CHIEF JUSTICE McIVER. The defendant was in-

dicted for the murder of one George Burris, and was found
guilty with a recommendation to mercy. The defendant
appeals upon the several exceptions set out in the record,
which raise but two questions: 1st. Whether there was error
in receiving certain statements made by the deceased as
"dying declarations." 2d. Whether the Circuit Court
erred in admitting the testimony of one Wilson, offered in
reply by the State, tending to show that the defendant had
made threats against the deceased.

First, as to the admissibility of the so-called dying decla-
rations. For a proper understanding of this question, it
will be necessary to make the following statement, gathered
from the "Case" as prepared for argument here, as well as
from the supplemental testimony embraced in the argument
of the solicitor, which was consented to by counsel
for appellant, provided they be allowed twenty days
in which to submit "additional testimony and further
argument," of which proviso, however, the appellant's coun-
sel have not availed themselves. It seems that the deceased
was shot on the morning of the 3d of October, 1899, be-
tween 9 and 10 o'clock, and the witness, Cato Williams, who
found him some ten or fifteen minutes after he was shot
lying in the yard near the well, heard him say that "he was
shot and shot bad." This witness, in the supplemental testi-
mony embraced in the argument of the solicitor, is repre-
sented as saying that he saw the deceased again that after-
noon at his house, about 3 or 4 o'clock, and when asked
whether George—the deceased—said anything about dying,
replied: "He never said anything to me about dying except
at the well. He said he was shot and did not expect to live.
He said he was shot bad and didn't expect to get over it."
This manifestly refers to what the witness heard the de-
ceased say, in the morning at the well, a very short time
after he was shot; for he adds to his testimony just quoted
the following: "And the other at home I don't know any-
thing about that."

The next witness offered to prove the alleged dying decla-

rations was C. H. Sandifer, a magistrate, who reduced the statement of deceased to writing. This witness testified that he in company with the sheriff about 3 or 4 o'clock in the afternoon of the day on which deceased was shot, came back past there, and found him sleeping under the influence of opiates. "We waked him up, shook him," and then he made the statement in question; but when examined as to whether the deceased was conscious of his condition, he testified as follows: "Q. The boy, George, said nothing to you about whether he was going to die or not? A. No. I told him that he could make it (referring to the statement), if he wished; that he might die; that if he had any statement to make, to now make it. Q. You told him he might die? A. Yes, sir. Q. He didn't say whether he was going to die or not? A. No, sir, he didn't say. Q. You say he was under the influence of morphine at the time? A. Seemed so, he was breathing pretty heavy and seemed resting. Q. Didn't seem concerned about himself? A. No, sir, we had to shake him to keep him awake. Q. But he didn't seem to manifest any concern about himself whether he would get well or not? A. No, he seemed to be perfectly easy."

It seems that another witness, J. N. Gillespie, had previously testified that he had seen the deceased in the morning after he was shot, and when asked if deceased had said anything about dying, replied, "Yes, sir. He just told me he had no hope of himself." But there being some doubt as to the time when the deceased made this statement, the witness, Gillespie, was recalled, when he said that this statement was made to him by the deceased after dark, about 9 or 10 o'clock at night of the day deceased was shot; and that the deceased lived until about 12 o'clock the next day. The rules in regard to the admissibility of dying declarations are well settled. 1st. That death must be imminent at the time the declarations in question are made. 2d. That the declarant must be so fully aware of this as to be without any hope of life. 3d. That the subject of the charge must be the

death of the declarant, and the circumstances of the death must be the subject of the declarations. *State* v. *Johnson,* 26 S. C., 153, and the cases therein cited, recognized and followed in the subsequent cases of *State* v. *Bradley,* 34 S. C., 139, and *State* v. *Banister,* 35 S. C., 295. Now, while the 3d of these requirements was met in this case, and possibly the 1st also, although the death did not occur until the next day, yet we are unable to discover any evidence that the 2d requirement was met; for there is nothing to show that the deceased at the time he made the declarations in question, was so fully aware that his death was imminent, as to have lost all hope of recovery; but the testimony rather tends to show the contrary. The deceased was sleeping quietly, "he seemed to be perfectly easy," and when roused up and asked if he did not want some milk, sat up in bed and drank a glass of milk, and then made the declarations admitted in evidence. He certainly said nothing and did nothing tending to show that he was conscious of impending death. The doctor who had seen him and given him some powders was not examined as to his condition, nor asked his opinion as to whether death was imminent, so far as the record before us shows. Even when told by the witness who took the statement that he might die, and if he wished to make any statement he could do so, the deceased expressed no apprehension, and in no way indicated that he was uneasy about his condition. On the contrary, when the witness was asked whether deceased seemed to be concerned about himself, replied: "No, sir, we had to shake him to keep him wake. Q. But he didn't seem to manifest any concern about himself, whether he would get well or not? A. No, sir, he seemed to be perfectly easy." This certainly is not such evidence as the rule contemplates. But it is contended that the testimony of Cato Williams, copied above, is sufficient to show that deceased had lost all hope of recovery. This witness seems to have been the first person who reached the deceased after he was shot—a very few minutes afterwards—and when first asked what the deceased said, did not

say that the deceased said anything about dying, only said, "He was shot, and shot bad." Subsequently, when asked: "Q. Did George (the deceased) say anything about dying? A. He never said anything to me about dying except at the well. He said he was shot and didn't expect to live. He said he was shot bad and didn't expect to get over it. And the other at home I don't know anything about that." This conversation between the witness and the deceased, thus amplified beyond his first statement of such conversation, manifestly occurred at the well but a very short time after the deceased was shot down, several hours before the deceased was removed to his home; and while it may be true that, under the excitement of the moment he may have used the language last attributed to him by the witness, indicating that he *then* feared that the shot would prove fatal, yet several hours afterwards, when he had been removed to his house, and seemed to be resting "perfectly easy," it does not at all follow that he still entertained the same apprehensions. On the contrary, the witness who took the statement offered in evidence, says that he did not then seem to manifest any concern about himself, which he undoubtedly would have done if he then supposed death was imminent. Again, it is said that his declarations to the witness, Gillespie, that "he had no hope of himself," show that he was conscious of his condition; but it is manifest that such declaration was made some four or five hours after the witness, Sandifer, took down the statement offered in evidence, and it might well be that he had then lost hope of himself, though it is far from showing that he had lost hope when he made the statement to Sandifer, several hours before. It is true that Gillespie when first on the stand did testify that the statement made to him was before Sandifer had seen the deceased, but when recalled to the stand for the purpose of explaining when it was he heard deceased say that he had no hope of himself, he not only says that it was after Sandifer had seen the deceased, but fixes the time specifically as after dark, about 9 or 10 o'clock at night, which was some four or five

hours after the statement was made to Sandifer, about 3 or 4 o'clock in the afternoon. Now, in view of the fact that "dying declarations" constitute one of the exceptions of the rule rejecting hearsay evidence (I. Greenleaf on Ev., sec. 156), and in view of the following language in sec. 158 of the same volume: "It is essential to the admissibility of these declarations, and is a preliminary fact, to be proved by the party offering them in evidence, that they were *made under a sense of impending death,*" it seems to us that there was error in receiving in evidence the statement taken down in writing by the witness, Sandifer, as the dying declaration of the deceased.

The second question is whether there was error in receiving the testimony of one Wilson, when offered in reply by the State, tending to show that defendant had made threats against the deceased prior to the homicide. This testimony was objected to by defendant's counsel upon the ground that it was not in reply to any testimony offered for the defense; but the objection was overruled. It does not appear in the "Case" as prepared for argument here, or from the supplement found in the argument of the solicitor that the defendant had offered any testimony to which the testimony of the witness, Wilson, could in any sense be regarded as a reply. Nor does it appear in any part of the record before us that the testimony of Wilson tended to contradict anything testified to by the defendant. Indeed, it nowhere appears that defendant was ever examined as a witness in his own behalf. All that we can find in the "Case" in regard to threats is the following statement: "After the State had rested its case, the defendant introduced his testimony, showing among other things, that deceased was unfriendly to him (the accused), and had made threats to do him injury at various times before the homicide. The State in reply, offered also to prove threats made by the accused, and for this purpose examined Steve Wilson;" then followed the testimony of said Wilson to the effect that the accused had said: "When I meet George (the

deceased) again, I am going to shoot his heart strings out."
This testimony, while no doubt competent, it it had been
offered by the State when developing its testimony in chief,
when the defendant would have had an opportunity to con-
tradict or explain it, was clearly incompetent in reply, for it
was not in reply to any testimony adduced by the defendant.
It certainly was not in reply to the testimony offered by the
defendant tending to show that the deceased "had made
threats to do him (the defendant) injury at various times
before the homicide." For it might be perfectly true that
each of the parties had made threats against the other, and
the fact, if fact it be, that the deceased had made threats
against the defendant, did not in any way tend to show that
the defendant had or had not made threats against the de-
ceased. The testimony of Wilson was clearly incompetent
when offered by the State in reply, and upon this ground
also there should be a new trial.

The judgment of this Court is, that the judgment of the
Circuit Court be reversed and the case be remanded to that
Court for a new trial.